**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

J. TODD DERBIN and HOPE TASSIE     :
DERBIN,     :
    :
     Plaintiffs,     :     Civil Action No.: 11-812(FLW)
    :
    :
    :         **OPINION**
     v.     :
    :
ACCESS WEALTH MANAGEMENT, LLC;   :
ELEANORE K. SZYMANSKI; LAWRENCE   :
ZAGOROLA; HOWARD HOOK; MICHAEL   :
PALAZZOLO; and DARREN ZAGAROLA;   :
    :
     Defendants.     :
_____:

**<u>WOLFSON, United States District Judge</u>:**

     Presently before this Court is a motion to compel arbitration and to stay proceedings, filed by Defendants, Access Wealth Management, LLC. ("AWM"), Eleanor K. Szymanski, Lawrence Zagarola, Howard Hook, Michael Palazzolo, and Darren Zagarola ("Individual Defendants") (collectively, "Defendants").  This case arises out of a dispute related to a series of agreements (the "Agreements") executed between Plaintiffs J. Todd Derbin and Hope Tassie Derbin ("Plaintiffs") and EKS Associates, LLC ("EKS"), for services to invest and manage Plaintiffs' finances.  After initially bringing claims against AWM, EKS, Szymanski and Zagarola in an arbitration proceeding, Plaintiffs withdrew all claims from arbitration except those

against EKS, and brought those claims to this Court.   In the instant motion, Defendants move to compel Plaintiffs to arbitrate their claims pursuant to the arbitration clause contained in the Agreements.   For the reasons set forth herein, the Court finds that Plaintiffs' claims are arbitrable and thus, Defendants' motion is **GRANTED** and this case is **STAYED**.

## BACKGROUND

For the purposes of this motion, the Court will only recount relevant facts.[1] In February 2006, Plaintiffs hired Szymanski, former managing partner of EKS, to create and implement a comprehensive plan to manage and invest Plaintiffs' finances by entering into a written Financial Planning Agreement.   See Compl., ¶¶ 1, 22.   Pursuant to that agreement, EKS would prepare a written financial plan for Plaintiffs based upon their stated investment objectives.   Id.   In September 2006, the parties entered into a second Financial Planning Agreement whereby EKS agreed to provide financial planning services to Plaintiffs.   Id. at ¶75.   Pursuant to a third Financial Planning Agreement, dated January 1, 2007, Plaintiffs renewed the September 2006 agreement for services to be performed in 2007.   Id. at ¶ 115. These agreements included an arbitration provision which states:

> Arbitration: All controversies arising out of or relating in any manner to the ASSETS, to transactions effected with or by the PLANNER or relating to advice rendered by the PLANNER or its initiation or implementation of transactions based upon such advice, or any other matter arising under the Agreement or relating to any alleged breach thereof… shall be determined by arbitration… **It is understood that such arbitration is final and binding upon the parties and that by executing this Agreement the CLIENT is waiving his/her**

---

[1]      The following facts are undisputed unless otherwise noted by the Court.

> **right to seek remedies in court, including the right to a jury
> trial, and CLIENT has had a reasonable opportunity to review
> same, and discuss this arbitration provision with counsel of
> his/her choosing, prior to the execution of this Agreement.**

See 2006 Financial Planning Agreement, ¶ 7 (bold in original).

In August 2007, EKS sent a letter to Plaintiffs stating its intention to merge with defendant AWM.  Included in the letter was a request for Plaintiffs' signature to permit AWM access to Plaintiffs' financial information during the transition. Compl., ¶¶ 149-50.  Plaintiffs did not sign this request; however, AWM allegedly accessed Plaintiffs' accounts through EKS. Id. at ¶ 151.  According to the Complaint, EKS and AWM's alleged merger was completed by October 2007. Id. at ¶ 161.  However, Plaintiffs stress that they did not consent to the merger, nor sign a new agreement with AWM. Id. at ¶¶ 163, 164, 166.  Plaintiffs explain that they were under the impression that post-merger, EKS would continue to be responsible for the management of Plaintiffs' accounts.  Nevertheless, Plaintiffs allege that AWM professionals were managing Plaintiffs' account beginning in October 2007. Id. at ¶¶ 171-72, 214.

In December 2007, a quarterly investment report was sent to Plaintiffs. Included in this report was a statement notifying Plaintiffs of the completion of the merger between EKS and AWM. Id. at ¶ 175.  In January 2008, EKS sent Plaintiffs a financial planning agreement to renew their services for 2008; Plaintiffs did not sign this agreement. Id. at ¶ 177.  Despite the non-renewal, Plaintiffs continued their financial relationship with the purported merged entity. Id. at ¶¶ 209.

Disputes, relating to the alleged mismanagement of Plaintiffs' finances, subsequently arose between Plaintiffs and Defendants. As a result, Plaintiffs sent a letter to EKS notifying EKS of their desire to arbitrate claims arising from the alleged breach of contract, professional negligence, and fraud. Id. at ¶ 227. Thereafter, in August 2010, relying on the arbitration provision in the Agreements, Plaintiffs requested arbitration with the American Arbitration Association ("AAA") against both EKS and AWM. See Plaintiffs' Demand for Arbitration. In their original arbitration demand, Plaintiffs alleged:

> Respondents breached the Agreement and committed professional negligence by, among other things, failing to provide a comprehensive and sound plan, failing to allocate assets in safe investments, encouraging and facilitating high risk trades and transactions, using a margin account without authorization, and otherwise failing to act with the ordinary care and skill of a financial planning professional.

Id.

Initially, Plaintiffs, defendant AWM, and EKS proceeded in arbitration. EKS and AWM answered the arbitration demand in October 2010. See Carlis Dec., ¶ 5. In December 2010, Plaintiffs field an amended demand for arbitration to bring claims against defendants Szymanski and Zagarola, individually. See Amended Demand for Arbitration. Notably, in their demand, Plaintiffs made no distinctions as to which entity or individual is liable for the alleged conduct; rather, the defendants were referenced in the demand collectively.

During the course of the arbitration proceeding, Plaintiffs served EKS and AWM with "voluminous and detailed requests for information." Compl., ¶ 231. Specifically, Plaintiffs requested information regarding EKS' and AWM's merger.

According to Plaintiffs, neither entity provided any information to substantiate the merger.  Moreover, because Plaintiffs did not discover any records of the merger between AWM and EKS, in February 2011, Plaintiffs withdrew their arbitration claims against AWM, Syzmanski, and Zagarola, and initiated this action.  Plaintiffs reason that because there is no agreement to arbitrate between Plaintiffs and Defendants, the claims against Defendants are properly before this Court.   In response, Defendants filed the instant motion to stay proceedings and compel arbitration.

## DISCUSSION

### I.   Standard of Review

The Federal Arbitration Act ("FAA") provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 2.  Under the FAA, "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574 (1960). "Where the contract contains an arbitration clause, there is a presumption of arbitrability." McKinstry Co. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 16, 859 F.2d 1382, 1385 (9th Cir. 1988).

When examining the arbitrability of an issue, a court should "'independently review the agreement'" and "'exercise plenary review to determine whether the matter is arbitrable.'" <u>Int'l Union of Bricklayers & Allied Craftworkers, Local 5 v. Banta Tile & Marble Co.</u>, Inc., 344 Fed. Appx. 770, 772 (3d Cir. 2009) (quoting <u>McKinstry Co.</u>, 859 F.2d at 1385 (9th Cir. 1988) (citation omitted)). The Third Circuit has held that the FAA "provides that a court should not order arbitration unless it is satisfied that the making of the agreement for arbitration… is not in issue." <u>Par-Knit, Inc. v. Stockbridge Fabrics Co.</u>, 636 F.2d 51, 54 (3d Cir. 1980). If the making of the arbitration agreement is at issue, the court shall proceed to resolve that issue. <u>Id.</u> In that regard, the Supreme Court has explained that courts should be aware of their limited role in deciding these questions:

> While a court … must determine whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the substantive scope of that agreement, its function is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

<u>United Steelworkers of Am. v. American Mfg. Co.</u>, 363 U.S. 564, 567-68 (1960); <u>see also</u> <u>United Paperworks Int'l Union, AFL-CIO v. Misco, Inc.</u>, 484 U.S. 29, 36-37 (1987).

In determining whether to enforce an arbitration agreement, a court must engage in a "two-step inquiry into (1) whether a valid agreement to arbitrate

existed and (2) whether the particular dispute falls within the scope of the agreement." Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005) (citing AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986)). In certain situations, a non-signatory to an arbitration agreement may compel a signatory to arbitrate. Arthur Andersen, LLP v. Carlisle, 129 S. Ct. 1896, 1902 (2009); Epix Holdings Corp. v. Marsh & McLennan Co., 410 N.J. Super. 453, 463 (App. Div. 2009). This allows for "a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel' . . . ." Id.

In determining the issue of arbitrability, the court applies the summary judgment standard. Kaneff v. Del. Title Loans, Inc., 587 F.3d 616, 620 (3d Cir. 2009) ((Citing Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 n.9 (3d Cir. 1980) ("Application of [the summary judgment] standard to [arbitration determinations] is appropriate inasmuch as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate")). The party opposing the motion is given "the benefit of all reasonable doubts and inferences that may arise." Id. Therefore, the movant must prove through pleadings, depositions, affidavits, and answers to interrogatories that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Salvadori v. Option

One Mortg. Corp., 420 F. Supp. 3d 349, 353 (D.N.J. 2006) (citing Fed. R. Civ. P. 56(c)).

Rule 56(e) requires the nonmoving party who has the burden of proof at trial "to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp. v. Catrett, 54 U.S.L.W. 4775, 4777 (1986). The moving party may discharge its burden under Rule 56(c) by "pointing out to the District Court . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 4778. The court must consider all of the non-moving party's evidence and construe all reasonable inferences in the light most favorable to the non-moving party. Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

## II.    AWM has Standing to Compel Arbitration

Plaintiffs do not challenge the validity of the Agreements entered into with EKS. Indeed, Plaintiffs are signatories to these Agreements which contain an arbitration provision for disputes arising out of the management of Plaintiffs' finances. Moreover, it is not disputed that AWM is not a signatory to these Agreements. Instead, Defendant invokes equitable estoppel to compel Plaintiffs to arbitrate. Therefore, central to the disposition of the instant dispute is whether AWM has standing to compel arbitration as a non-signatory party to the Agreements.

New Jersey recognizes a non-signatory right to compel arbitration based on the principle of equitable estoppel. <u>Epix Holdings</u>, 410 N.J. Super at 463.  "The equitable estoppel inquiry is fact specific . . . and usually involves an analysis of the connection between the claim, the arbitration agreement, and the parties."  <u>Id.</u> at 464. "Where the inextricable connectivity [is] not considered dispositive of the issue[,] the combination of the requisite nexus of the claim to the contract together with the integral relationship between the non-signatory and the other contracting party [serve] as a sufficient basis to invoke estoppel."  <u>Id.</u> at 466. It is important that "issues to be litigated are intertwined with [the] agreement containing the arbitration clause." <u>Bruno v. Mark MaGrann Assoc.</u>, 388 N.J. Super. 539, 548 (App. Div. 2006).

To illustrate this concept, in <u>Bruno</u>, homeowners brought suit against their developer asserting that the heating units in their homes did not work properly. The suit was dismissed in favor of arbitration pursuant to an arbitration clause contained in the parties' contract. 388 N.J. Super. at 542. The homeowners then brought suit against the subcontractors with whom the homeowners had no contractual relationship. This suit was also dismissed and sent to arbitration by the court based upon estoppel because the court found that although there was no contractual relationship with the subcontractors, the homeowners' claims "presented the same factual allegations" against the developer and arose directly out of the contracts between the homeowners and the developer. <u>Id.</u> at 548.

To further clarify the principles of estoppel in this context, the court in <u>Epix Holdings</u> explained that applying estoppel is appropriate when a non-signatory party meets the following factors: (1) it is clearly aligned to a signatory party; (2) no factual assertions are alleged such that it performed different acts as those alleged against the signatory party; (3) claims against it are the same as those against a signatory party; and (4) that claims against it are bound up with the underlying agreement between the plaintiff and a signatory party. <u>Epix Holdings</u>, 410 N.J. Super. at 463-70; <u>see</u> <u>E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.</u>, 269 F.3d 187, 195 (3d Cir. 2001) (the court "bound a signatory to arbitrate with a non-signatory at the non[-]signatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non[-]signatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.").

The Court assesses each of these factors in turn.

## 1. Alignment

Here, Plaintiff argues that since EKS and AWM are two separate entities, AWM cannot be considered sufficiently aligned to EKS such that it can be permitted to compel arbitration in this case. On the other hand, AWM argues that it is clearly aligned to EKS because they merged in October 2007 when AWM purchased EKS. Indeed, New Jersey courts acknowledge that arbitration can be compelled when a non-signatory is closely aligned to a contracting party in instances such as parent or

10

successor corporation, or an existence of agency relationship. <u>Epix Holdings</u>, 410 N.J. Super. at 466-7 (citing <u>Angrisani v. Fin. Tech. Ventures, L.P.</u>, 402 N.J. Super. 138, 143 (App. Div. 2008)).  In addition, "courts have concluded that a non-signatory may compel arbitration where the estopped plaintiff either specifically pleaded that the non-signatory and signatory conspired together or otherwise treated the non-signatory . . . 'as if it were a signatory.'"  <u>Id.</u> at 467 (citation omitted).  As a threshold inquiry to third-party standing, it is incumbent upon the Court to examine each of these relationships in determining whether AWM is closely aligned with EKS.

### a.  Successor Relationship

New Jersey courts have permitted a non-signatory who is either a parent or successor corporation to a signatory party to compel arbitration. <u>See, e.g.</u>, <u>Singer v. Commodities Corp.</u>, 292 N.J. Super. 391, 411-15 (App. Div. 1996) (holding that a securities broker who signed an employment agreement could be compelled to arbitrate an employment-related claim against a successor who had not been a signatory to the original agreement containing the arbitration provision); <u>Sunkist Soft Drinks v. Sunkist Growers Inc.</u>, 10 F.3d 753, 757 (11th Cir. 1993) (holding that where the original signatory to a license agreement was later acquired and became a part of the parent corporation and there was a nexus between the plaintiff's claims and the license agreement, the plaintiff was equitably estopped from avoiding arbitration with parent corporation).

Here, because a genuine issue of material fact exists as to whether AWM and EKS have merged, AWM cannot compel arbitration under this basis.  See Vilches v. Travelers Cos., 413 Fed. Appx. 487, 490-91 (3d Cir. 2011) ("[a] court decides a motion to compel arbitration under the same standard it applies to a motion for summary judgment because the order compelling arbitration is in effect a summary disposition of the issue . . . ." (citations and internal quotations omitted)).   To demonstrate alignment through a merger, AWM solely relies on the allegations in Plaintiffs' Complaint.  Indeed, Plaintiffs allege that in August 2007, EKS mailed a letter to Plaintiffs informing them that a merger with AWM would take place, and in October 2007, AWM assumed responsibility of the management of Plaintiffs' assets and accounts.   Relying on these allegations, AWM argues that Plaintiffs knew that AWM was essentially "merging" with EKS and would become a successor in charge of Plaintiffs' financial accounts.   However, there is evidence that AWM and EKS have not merged.  Plaintiffs provided two documents from the New Jersey Business Entity Status Report; together they tend to indicate that EKS and AWM are separate entities.   Furthermore, Plaintiffs maintain that while in arbitration, AWM and EKS did not produce any evidentiary document describing the nature of the relationship between the two parties.   Indeed, AWM has not provided any competent evidence on this motion to substantiate the claim of a merger.[2]  Without

---

[2]      AWM also cites to its Answer in the arbitration proceeding as evidence that EKS and AWM have merged.  However, because an answer does not constitute a sworn statement, this document is insufficient to meet its burden on a summary judgment standard.

it, the Court finds that there is a material issue of fact as to whether AWM and EKS are aligned through a merger.[3]

### b. Agency Relationship

Traditional principles of agency law may also bind a non-signatory to an arbitration agreement in the context of equitable of estoppel. See Bel-Ray Co. v. Chemrite Ltd., 181 F.3d 435, 446 (3d Cir. 1999); Isidor Paiewonsky Associates, Inc. v. Sharp Properties, Inc., 998 F.2d 145 (3d Cir. 1993). A party can prove the existence of an agency relationship by showing (1) express or real authority has been definitely granted; (2) implied authority -- that is to do all that is proper, customarily incidental and reasonably appropriate to the exercise of the authority granted; or (3) apparent authority, such as where the principal by words, conduct, or other indicative manifestations has "held out" the person to be its agent. Hoddeson v. Koos Bros., 47 N.J. Super. 224, 232 (App. Div. 1957). Here, the Court focuses on implied or apparent authority because AWM has not established a contractual relationship between itself and EKS such that AWM has been granted any express or real authority by EKS or vice versa.

The New Jersey Supreme Court has explained that implied authority rests upon "the nature or extent of the function to be performed, the general course of conducting the business, or from particular circumstances in the case." Healthcare

---

[3]    Plaintiffs question whether a merger or "asset purchase" can constitute alignment for the purposes of applying equitable estoppel. While it appears that a merger of two companies would be sufficient to establish a successor relationship, the Court need not address this issue since it finds that AWM cannot compel arbitration on this basis.

Servs. Group, Inc. v. Royal Healthcare of Middlesex, LLC, 276 F. Supp. 2d 255, 260 (D.N.J. 2003) (citing Sears Mortgage Corp. v. Kaiser, 134 N.J. 326, 338 (quoting Carlson v. Hannah, 6 N.J. 202, 212 (1951)).  "[A]pparent authority imposes liability on the principal 'not as the result of the reality of a contractual relationship but rather because of the actions of a principal or an employer in somehow misleading the public into believing that the relationship or the authority exists.'" Estate of Cordero, ex rel. Cordero v. Christ Hosp., 403 N.J. Super. 306, 312 (App.Div. 2008) (citing Basil v. Wolf, 193 N.J. 38, 67 (2007) (internal quotations and citations omitted)).

Here, the parties have not expressly argued that the relationship between AWM and EKS was one of agency.  Similar to the lack of evidence to establish merger, AWM has failed to submit any evidence beyond the pleadings to show that any type of agency relationship existed.  Furthermore, AWM has not specifically pointed to any allegation to support its conclusory claim of an agency status and indeed, the pleadings do not support such a relationship. While Plaintiffs pepper the Complaint with language that would suggest AWM acted as an agent for EKS, these allegations are in the context of the merger between AWM and EKS.  In fact, AWM conceded in its reply brief that "the specific nature of the relationship [between AWM and EKS] may be fleshed out through the course of discovery in arbitration." See Reply Br., p. 11.  However, AWM is in the best position on this motion to establish any type of agency relationship between itself and EKS, but have failed to do so; accordingly, AWM has not met its burden.

### c. Plaintiffs' Treatment of AWM

Finally, the court in <u>Epix Holdings</u> has recognized that a non-signatory party has standing to enforce an arbitration agreement against a signatory party when the plaintiff has "pleaded that the non-signatory and signatory have conspired together or otherwise treated the non-signatory affiliate of the signatory as if it were a signatory." <u>Epix Holdings</u>, 410 N.J. Super. at 467 (citing <u>Astra Oil Co. v. Rover Navigation, Ltd.</u>, 3 F.3d 276, 280 (2d Cir. 2003) (holding that a party attempting to resist arbitration was estopped from doing so because it had treated non-signatory parties and their signatory assignees as a single unit in its complaint)(internal quotations omitted)); <u>see</u> <u>Amato v. KPMG, LLP</u>, 433 F. Supp. 2d 460, 485-87 (M.D. Pa. 2006); <u>FCMA, LLC v. Fujifilm Recording Media U.S.A., Inc.</u>, No. 09-4053, 2010 U.S. Dist. LEXIS 79129, at *18-10 (D.N.J. Aug. 5, 2010).

Here, Plaintiffs' actions, as illustrated by the Complaint, and their conduct in connection with the arbitration proceeding prior to commencing this lawsuit, demonstrate that they have treated AWM and EKS as one single entity.  To begin, Plaintiffs aver in their Complaint that AWM and EKS worked together to defraud Plaintiffs or otherwise jointly caused injuries to Plaintiffs.  <u>See, e.g.</u>, Compl., ¶¶ 4, 194, 202, 204, 212, 213, 220, 328, 335, 336, 337, 354, 355, 356.   More particularly, Plaintiffs allege that EKS and AWM "duped" Plaintiffs into becoming clients, <u>Id.</u> at ¶ 4, in that both entities made "the representations and concealed the critical information to induce [Plaintiffs] to sign the financial planning agreements and transfer their wealth to Defendants for management."  <u>Id.</u> at ¶¶ 348, 350, 351, 352,

368, 369.   In fact, in their allegations, Plaintiffs often refer to EKS and AWM collectively, without distinction as to whether EKS or AWM committed the alleged wrongdoing.  See, e.g., FCMA, 2010 U.S. Dist. LEXIS 79129 at *18 ("[w]ith respect to FFHC and FFHK, the allegations in the Amended Complaint do not differentiate between these two entities and Fujifilm  and FRMU. Instead, Plaintiff collectively lumps them together as "Fuji." There are no allegations specific to the various corporate entities, which are affiliated with one another . . . Therefore, the Court finds that equitable estoppel considerations make it appropriate for Plaintiff to be compelled to arbitrate its claims against FFHC and FFHK.").

More importantly, Plaintiffs treated AWM and EKS as one entity throughout their relationship.  Plaintiffs allege that EKS merged with AWM in October 2007, and that the merger resulted in a change of control of EKS.  Id. at ¶¶ 161-62.  While Plaintiffs assert that neither AWM nor EKS informed Plaintiffs of their legal rights upon the merger and that they did not consent to the merger, Plaintiffs continued their financial relationship with the merged entity without voicing any objections. Id. at ¶ 222.   Indeed, at first, Plaintiffs were under the impression that EKS, through the merged entity, continued to be responsible for the management of the financial accounts following the merger.  Id. at ¶¶ 171, 173.  However, Plaintiffs acknowledged that EKS had sent letters clearly indicating that EKS was no longer "personally" managing Plaintiffs' accounts.  Id. at ¶ 215.  In fact, Plaintiffs were communicating directly with AWM employees in 2008 through correspondence, and Plaintiffs had expected quarterly meetings with AWM, which never occurred.  Id. at

¶¶ 214, 225.   Even more damning, Plaintiffs originally instituted arbitration proceedings against AWM and EKS in the same forum.   Based upon Plaintiffs' dealings with both entities, the claims asserted against AWM in this case, not surprisingly, are supported by substantially similar factual allegations of wrongdoing as the claims asserted against EKS. See infra.   Accordingly, relying on Plaintiffs' own pleadings and conduct, the Court finds that Plaintiffs acquiesced to AWM's involvement in the management of their financial accounts and thus, treated AWM and EKS as one entity; this is sufficient for the Court to find that AWM and EKS were closely aligned for equitable estoppel purposes.

### 2. Claims and Illegal Conduct Asserted Against EKS are the Same as Those Against AWM

Plaintiffs rely on the same underlying facts in alleging of AWM's wrongdoing in the Complaint and EKS's alleged conduct in the arbitration proceeding.   Indeed, in the arbitration demand letter, Plaintiffs allege that EKS and AWM, as a merged entity, breached certain duties they owe to Plaintiffs without differentiating the two entities.   See Demand Letter dated August 10, 2010.   Similarly, with the exception that Plaintiffs did not consent to the merger between EKS and AWM, the underlying facts alleged in the Complaint generally correspond to those set forth in the arbitration demand letter.   As noted earlier, in Plaintiffs' arbitration demand against EKS, they defined, then, the nature of the dispute as follows:

> Claimant engaged Respondents to provide financial advisory services pursuant to a Financial Planning Agreement.   Respondent breached the Agreement and committed professional negligence by, among other things, failing to provide a comprehensive and sound plan, failing to allocate assets in safe investments, encouraging and facilitating high

risk trades and transactions, using a margin account without authorization, and otherwise failing to act with the ordinary care and skill of a financial planning professional.

Demand for Arbitration, p.1.

Not surprisingly, allegations of wrongdoing in this suit against AWM overlap EKS' alleged conduct in the pending arbitration, see infra, and most importantly, the claims, asserted against both entities, arose from the same transactions and occurrences and from the same financial planning agreements -- albeit Plaintiffs included additional claims in this Complaint arising out of common law fraud and the New Jersey Consumer Fraud Act.  However, while these additional claims are couched in different causes of action, the underlying facts asserted supporting these claims are identical to the alleged illegal conduct for which Plaintiffs seek to hold EKS liable.  See Epix Holdings, 410 N.J. Super. at 472-73 (a court must "focus on the factual allegations in the Complaint rather than the legal causes of action asserted.").  In fact, Plaintiffs allege in this Complaint that "Defendants" and EKS engaged in misconduct which resulted in the loss of their wealth; there is little or no distinction made between EKS and AMW, and references to EKS and AMW collectively appear throughout the Complaint.

### 3. Claims against AWM are Intertwined with the Underlying Agreements between Plaintiffs and EKS.

Contrary to Plaintiffs' assertion, the claims asserted against AWM are clearly inextricably intertwined with the financial planning agreements, which gave rise to

EKS's and AWM's alleged collective management of Plaintiffs' assets.[4]  Specifically, as Plaintiffs candidly concede, Count I – breach of contract – directly relates to the Agreements as Plaintiffs allege that Defendants failed to perform under those Agreements.  See Compl., ¶ 240.  Similarly, Counts II and III, negligence and breach of fiduciary duty, respectively, relate to the performance of the Agreements because those allegations involve the advice rendered by AWM as a result of the relationship established by the Agreements.  See Id. at ¶¶ 250, 252, 255, 256, 292-95.  Count IV, negligent misrepresentation, Count V, fraud, and Count VI, NJCFA, relate primarily to AWM's inducement of Plaintiffs to enter into the Agreements.  See Id. at ¶¶ 329, 332, 346, 348-51, 370-73.  These particular claims involve the formation of the Agreements and the subsequent alleged mismanagement of Plaintiffs' assets.[5]  In sum, without the Agreements between EKS and Plaintiff, no relationship between Plaintiffs and AWM would exist, and more importantly, no independent duties on the part of AWM would arise – these duties are central to Plaintiffs' claims.   Simply  stated,  without  the  existence  of  the  Agreements,

---

[4]     As the analysis of whether the claims asserted against AWM fall within the scope of the Agreements requires a different standard, the Court will discuss it infra.

[5]     There appear to be some inconsistencies in Plaintiffs' allegations. A substantial portion of the allegations in the Complaint pertain to the wrongful conduct of EKS prior to, and during, the execution of the financing agreements. Indeed, the Agreements were entered into by Plaintiffs and EKS prior to the alleged merger with AWM in October 2007. Despite that fact, however, according to Plaintiffs' allegations, AWM also was responsible for negligently and fraudulently inducing them to enter into the Agreements.

Plaintiffs' claims against AWM, as they are alleged in the Complaint, would have no factual or legal basis.

Given the alleged integral relationship between AWM and EKS, the identity of Plaintiffs' claims against both, and further, the close nexus of Plaintiffs' claims with the financing agreements, the Court concludes, on the basis of estoppel, that AWM has standing as a non-signatory to compel arbitration. Having found that AWM has standing to compel arbitration, the Court next considers whether Plaintiffs' claims against AWM fall within the scope of the arbitration provision of the Agreements.

### 4. The Claims Fall within Scope of the Arbitration Provision

The Supreme Court has recently reconfirmed that the FAA reflects a "'liberal federal policy favoring arbitration.'" AT&T Mobility LLC v. Concepcion, 131 S.Ct. 1740, 1745 (2011) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). Thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or any allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone, 460 U.S. at 24-25; see also Volt Information Sciences v. Board of Trustees, 489 U.S. 468, 476 (1989) ("There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."); Gray Holdco, Inc. v. Randy Cassady and RWS, LLC, No. 10-4325, 2011 U.S. App. LEXIS 17032, at *12 (3d Cir. Aug. 17, 2011).

When determining the scope of an arbitration clause, there is a presumption in favor of arbitrability. Century Indem. Co. v. Certain Underwriters at Lloyd's, 584 F.3d 513, 527 (3d Cir. 2009); Cadwell v. KFC Corp., 958 F. Supp. 962, 973 (D.N.J. 1997). "An order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960)). The Third Circuit has made clear, however, that "positive assurance" does not mean absolute certainty. Paine Webber, Inc. v. Hartmann, 921 F.2d 507, 512 (3d Cir. 1990). While "genuine interpretive disputes should be resolved in favor of arbitrability... a compelling case for non-arbitrability should not be trumped by a flicker of interpretive doubt." Id. at 513. Rather, the parties' intent in drafting the arbitration clause is the touchstone by which district courts should judge whether a matter is arbitrable. Id.   Indeed, New Jersey courts follow the same principles when determining the scope of an arbitration agreement.  See Epix Holding, 410 N.J. Super at 471-72.

Here, the language of the arbitration provision in the Agreements provides:

Arbitration: All controversies arising out of or relating in any manner to the ASSETS, to transactions effected with or by the PLANNER or relating to advice rendered by the PLANNER or its initiation or implementation of transactions based upon such advice, or any other matter arising under the Agreement or relating to any alleged breach thereof… shall be determined by arbitration… **It is understood that such arbitration is final and binding upon the parties and that by executing this Agreement the CLIENT is waiving his/her right to seek remedies in court, including the right to a jury trial, and CLIENT has had a reasonable opportunity to review**

**same, and discuss this arbitration provision with counsel of his/her choosing, prior to the execution of this Agreement.**

See 2006 Financial Planning Agreement, ¶ 7 (bold in original).

The Court must bear in mind that "when phrases such as 'arising under' and 'arising out of'" appear in [an] arbitration provision, they are normally given broad construction, and are generally construed to encompass claims going to the formation of the underlying agreements," as well as the execution of the agreement. Epix Holding, 410 N.J. Super at 472; Battaglia v. McKendry, 233 F.3d 720, 727 (3d Cir. 2000); Medtronic AVE Inc. v. Cordis Corp., 367 F.3d 147 (3d Cir. 2004). Because of such expansive language, so long as the factual allegations "touch matters covered by the parties' contract, then those claims must be arbitrated, whatever the legal labels attached to them." Id. Here, the Court finds at the outset that the language of the arbitration provision establishes a broad parameter.  In that regard, the parties agreed that any and all claims which Plaintiffs may bring arising out of or relating in any way to the Agreements are arbitrable.  More specifically, all controversies arising out of or relating in any manner to Plaintiffs' assets, to any transactions effected with or by AWM, to any advice rendered by AWM, or any other matter under the Agreements or relating to any breach thereof, are subject to arbitration.  With this interpretation, the Court examines the claims to determine whether they fall within the scope of the provision.

With respect to Counts I, II and III, allegations of breach of fiduciary duties and negligence, as well as breach of the financing agreements all relate to the performance or non-performance of the Agreement, and as such, they are arbitrable.

22

To illustrate, the plaintiffs, in the matter <u>FCC Partnership, LP v. Rosen Capital Partners, LP</u>, asserted several claims against defendant investment company, including, breach of contract, breach of fiduciary duty, and negligence, stemming from a withdraw of the plaintiffs' investments. <u>FCC Partnership</u>, No. 08-1691, 2009 U.S. Dist. LEXIS 86596, at *14-15 (W.D. Pa. Aug. 31, 2009). Because the defendant had agreed to perform a monetary withdrawal of the plaintiffs' funds but neglected to take immediate action, the plaintiffs alleged that this failure resulted in an 85% loss in their initial investment. The defendant argued that the claims should be brought in arbitration because the arbitration agreement covered "[a]ny controversy between Subscriber and the Fund or the General Partner involving the Fund, this Agreement, or the Limited Partnership Agreement." <u>Id.</u> at *12-13. In concluding that plaintiffs' claims fell within the language of the agreement, the court reasoned that language of an arbitration provision providing that "any controversy, claim or dispute arising out of or relating" is one subject to the broadest interpretation. <u>Id.</u> at *20 (citing <u>Medtronic</u>, 367 F.3d at 150-51). Because all of the plaintiffs' claims arose from the loss of their finances due to the defendant's alleged failure to withdraw, those claims were subject to arbitration. <u>Id.</u> at *20-21.

Similar to the claims in <u>FCC Partnership</u>, here, Plaintiffs' claims of breach of fiduciary duties, breach of contract and negligence all arose because of the relationship established by the Agreements and as such, they relate to the Agreement; these claims are undoubtedly covered by the broad language of the arbitration provision. <u>See</u> <u>In re NBR Antitrust Litig.</u>, 207 Fed. Appx. 166, 172-73

(3d Cir. 2006) (held that the claim of breach of fiduciary duty was arbitrable under an expansive arbitration provision because the source of the duties stemmed from the various agreements entered into by the parties); see also Alfano v. BDO Seidman, LLP, 393 N.J. Super. 560, 575-76 (App. Div. 2007) (found that a broad arbitration agreement encompassed claims of negligence, breach of fiduciary duty and breach of contract).

Likewise, Plaintiffs' tort claims of negligent misrepresentation and common law fraud, as well as the statutory consumer fraud claim are also subject to arbitration.  In New Jersey, "as a general rule, courts have construed broadly worded arbitration clauses to encompass tort, as well as contract claims."  Alfano, 393 N.J. Super at 575 (citing Bleumer v. Parkway Ins. Co., 277 N.J. Super. 378, 402-08 (Law Div. 1994)).  In particular, "[a]rbitration provisions using [] expansive language are construed to require arbitration of statutory claims . . . ." Griffin v. Burlington Volkswagen, Inc., 411 N.J. Super. 515, 519 (App. Div. 2010).  This well-established principle can be traced to the Supreme Court's early decision in Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967), wherein the Court declared that an arbitration clause referring to "any controversy or claim arising out of relating to" the agreement would necessarily cover a plaintiff's claim of fraud in the inducement. Id. at 406.  And, New Jersey courts have so enforced this rule.  See Epix Holding, 410 N.J. Super at 472 ("when phrases such as 'arising under' and 'arising out of' appear in arbitration provision, they are normally given broad

construction, and are generally construed to encompass claims going to the formation of the underlying agreements.").

Here, Plaintiffs' negligent misrepresentation and fraud claims relate primarily to allegations that AWM made false misrepresentations and concealed material information in order to induce Plaintiffs to sign the Agreements.  In that respect, those two claims are clearly arbitrable.  See, e.g., Childs v. Meadowlands Basketball Assocs., 954 F. Supp. 994, 1000 (D.N.J. 1999).  In pleading negligent misrepresentation, Plaintiffs allege that Defendants "made representations and concealed the critical information to induce Derbins to sign the financial agreements." Compl., ¶ 329. Additionally, Plaintiffs assert that "Defendants represented to the Derbins that the Account was non-discretionary" when in fact it was a discretionary account. Id. at ¶¶ 331, 350.  To the extent that these allegations relate to AWM's alleged fraudulent or negligent misrepresentations during the formation of the contracts, they are subject to arbitration.  On the other hand, to extent that the allegations relate to "fraudulent performance" of the Agreements, see, e.g., Id. at ¶¶ 338-343, 352-360, they require references to the Agreements in order to determine the rights and obligations of the parties under the Agreements; thus, those portions of the claims are also subject to arbitration.  In sum, nowhere in the pleadings of these claims do Plaintiffs allege any wrongful conduct that does not require reference to the underlying agreements.

Finally, Plaintiffs' NJCFA claim -- which is premised upon substantially similar factual allegations as their common law fraud and negligent

misrepresentation claims -- are also subject to arbitration.  See Epix Holdings, 410 N.J. Super. at 472-73 (a court must "focus on the factual allegations in the Complaint rather than the legal causes of action asserted.").  Accordingly, the Court finds that all claims asserted against AWM in this case should have first been brought in arbitration.[6]

## III.   Individual Defendants

Plaintiffs also assert the same claims against the Individual Defendants.  While Plaintiffs oppose arbitrating claims against AWM, they have not advanced any particular arguments as to why the claims against the Individual Defendants should not be subject to arbitration.  Having determined that Plaintiffs are bound to arbitrate against AWM by way of equitable estoppel, and that claims against EKS are already in arbitration, these two entities' agents, employees and representatives are also covered under the terms of the Agreements.  Indeed, the Third Circuit squarely addressed this issue in Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1121-22 (3d Cir. 1993).

---

[6]      Plaintiffs further argue that policy considerations should militate in favor of proceeding in this forum.  Plaintiffs reason that because they consistently objected to the merger of EKS and AWM entities, they should not be forced to arbitrate their claims against AWM asserted in this case.   The Court rejects Plaintiffs' arguments for two reasons: first, the Court has found that Plaintiffs' treatment of these two entities as one company is determinative when applying equitable estoppel; in so finding, the Court has declined to find the merger probative of the estoppel inquiry.  Second, generally, district courts may only refuse to compel arbitration on the basis of "a generally applicable principle of contract law under which the agreement could be revoked," Seus v. John Vuveen & Co., 146 F.3d 175, 183 (3d Cir. 1998), not on the basis of a particular state's public policy.

In <u>Pritzker</u>, the issue was whether a signatory to an arbitration agreement could be compelled to arbitrate claims it had against the agents of the other party to the agreement. As the court made clear at the outset, the result turned on a construction of the arbitration clause to which the trustees had agreed -- i.e., whether it was broad enough in scope to encompass claims against agents of the brokerage firm arising out of the relationship between the brokerage firm and the trustees. The court there found that by agreeing in the context of the customer's agreement to arbitrate "all controversies which may arise between us," the trustees had committed themselves to arbitrate claims against the firm and its agents arising out of the brokerage relationship.  The court further explicated that since the brokerage firm could act only through agents and employees, "an arbitration agreement would be of little value if it did not extend to [them]." <u>Id.</u> at 1122 (citation and quotation omitted).  Accordingly, "in keeping with the federal policy favoring arbitration," the circuit "extended the scope of the arbitration clauses to agents of the party who signed the agreements." <u>Id.</u>; <u>see</u> <u>Bel-Ray</u>, 181 F.3d at 444; <u>see</u> <u>also</u> <u>Farmland Dairies, Inc. v. Mile Drivers & Dairy Employees Union Local 680</u>, 956 F. Supp. 1190, 1196-97 (D.N.J. 1997); <u>Arnold v. Arnold Corp.</u>, 920 F.2d 1269, 1281-82 (6th Cir. 1990) (Because a principal is bound under the  terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements).  Notably, this agency principle has been adopted by New Jersey state courts.  <u>See</u> <u>Reljic v. Tullett Prebon Ams. Corp.</u>, No.

11-1323, 2011 U.S. Dist. LEXIS 66580, at *15-17 (D.N.J. Jun. 21, 2011) (citing Bleumer v. Parkway Ins. Co., 277 N.J. Super. 378 (Law Div. 1994)).

Here, Plaintiffs set forth the following: defendant Zagarola is the managing member and a majority equity owner of AWM; defendant Szymanski, at the time the Agreements were signed, was a managing member and equity owner of EKS; defendant Zagarola is a certified planner and an employee of AWM; defendant Hook is board certified planner and also an employee of AWM; and defendant Palazzolo is a board certified financial planner and at time of the dispute Palazzolo was an employee of AWM. Based upon Plaintiffs' own averments, there is no doubt that the Individual Defendants are current and former agents and employees of either AWM or EKS. Therefore, Plaintiffs' claims against them are likewise subject to arbitration. FMCA, 2010 U.S. Dist. LEXIS 79129 at *20 ("[a] contrary result would permit a plaintiff to avoid its arbitration agreement simply by naming individual defendants in addition to or in lieu of the signatory entity.").

Finally, because all of Plaintiffs' claims are subject to arbitration, and because Defendants requested a stay of the proceedings, the Court shall, pursuant to 9 U.S.C. § 3, stay this action pending arbitration. See Lloyd v. Hovensa, 369 F.3d 263, 269 (3d Cir. 2004) ("the plain language of § 3 affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration.").

DATED:  October 7, 2011                              /s/      Freda L. Wolfson
                                                     FREDA L. WOLFSON
                                                     United States District Judge